OPINION OF THE COURT
Daniel P. FitzGerald, J.
Police officers are exempt from prosecution for criminal possession of a weapon (Penal Law § 265.20), but does this exemption apply to a suspended police officer? Moreover, can a suspended police officer who carries a duplicate of his police shield be prosecuted for criminal possession of a forged instrument when he attempts to use the shield to identify himself as a police officer? Both these questions are raised in the present case.
On October 16, 1986, the defendant, a New York City police officer, was suspended from assigned duties for failure to submit to a "Dole” test (a chemical analysis of a urine sample to determine the presence of drugs in the body). Department regulations provide that all revolvers or pistols owned or possessed by a police officer as well as the officer’s police shield must be surrendered upon suspension. In accordance with these regulations the defendant surrendered both his service revolver and his shield.
On December 10, 1986, while still under suspension and prior to a hearing on whether the defendant should be terminated from the police force, he was stopped by police.[1] The defendant evidently knew the officer who stopped him and said, "Hi Curtis, I’m a police officer, my shield’s in my pocket, can I get it?” Subsequently, both a .25 caliber revolver and a replica of the police shield were discovered in his pants pocket.
The defendant was then indicted for criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]) and criminal possession of a forged instrument in the second degree (Penal Law § 170.25). He moves for a dismissal of both counts.
THE WEAPONS COUNT
The defendant argues he is exempt from prosecution for *148 criminal possession of a weapon in the third degree (Penal Law § 265.02) because of his status as a police officer.
The exemption provided by section 265.20 of the Penal Law states, in relevant part:
"a. Section * * * 265.02 * * * shall not apply to:
"1. Possession of any of the weapons * * * specified in section * * * 265.02 * * * by the following * * *
"(b) Police officers as defined in subdivision thirty-four of section 1.20 of the criminal procedure law.”
CPL 1.20 (34) (d) defines a "police officer” as a "sworn officer of an authorized police department or force of a city”.
Although he was suspended from assigned duties, the defendant was nevertheless a sworn officer and a member of the New York City Police Department during the period of his suspension. An officer remains cloaked with that status until he is terminated pursuant to the internal rules and regulations of the disciplinary arm of the police force.[2] Neither the Penal Law nor the Criminal Procedure Law recognizes any distinction among police officers contingent on their good standing in the force. The designation of certain officers who have violated police department rules as being "suspended” is solely an internal policy matter handled within the police department in accordance with their own rules and regulations. It is not a matter which the Legislature has addressed in the context of criminal law. On its face, then, it would appear that the defendant is entitled to the exemption provided in Penal Law § 265.20. The statute is unambiguous, and it is fundamental that in interpreting a statute a court should first look to the particular statutory language and be guided by its natural and obvious meaning (see, Capital Newspapers v Whalen, 69 NY2d 246, 251; Price v Price, 69 NY2d 8, 15-16; *149 McKinney’s Cons Laws of NY, Book 1, Statutes §76). "[I]f there is nothing [in the statute] to indicate a contrary intent, terms of a general import will ordinarily be given their full significance without limitation” (Price v Price, 69 NY2d, supra, at 15), and where the meaning of the statute is unequivocal, "there is no necessity for resort to rules of construction”. (New Amsterdam Cas. Co. v Stecker, 3 NY2d 1, 6.)
The People argue, however, that since the statutory exemption exists solely by virtue of the defendant’s employment, it is subject to the reasonable rules and regulations of his employer. Thus, they argue, the employer has the power to restrict the scope of the exemption even without direct legislative authority to do so. The People cite as authority of this position a line of cases beginning with Matter of Salata v Tolman (38 AD2d 991). (See also, Figaro v Ward, 86 Misc 2d 530; Triborough Bridge & Tunnel Auth. Sergeants & Lieutenants Benevolent Assn. v Cawley, 76 Misc 2d 930.) Each of these cases was a civil CPLR article 78 proceeding initiated by employees seeking to enjoin their employers from issuing rules to regulate the possession and carrying of firearms as a condition of employment. The employees argued that, as peace officers, the statutory exemption gave them an unconditional right to possess and carry firearms wherever and whenever they pleased, unfettered from internal employment rules and sanctions. In Salata (supra) the Appellate Division, Third Department, disagreed and held the exemption conferred by Penal Law § 265.20 "cannot be construed as creating a vested right * * * [to possess weapons]. As employees * * * they are subject to and must abide by the rules and regulations resulting from the exercise of the discretion of [their employers].” (38 AD2d, supra, at 991.) The People argue that Salata and its progeny permit the employer to modify the statutory exemption. But in so doing, they have misunderstood the limited application of these cases. The holding of Salata was a narrow one; it held the Penal Law exemption did not preempt employers from making reasonable rules to regulate the safety of the workplace. The decision did not address the issue of whether penal sanctions would apply to employees who violated such rules, nor did it hold that the promulgation of such rules would operate to modify the scope of the exemption as it relates to penal — as opposed to civil or internal — sanctions.
Salata (supra) states clearly there is no absolute and unconditional right for peace officers to carry firearms where workplace rules forbid it, but it does not imply that criminal *150 liability should attach for a violation of the employer’s rules. Moreover, since there is no statutory authority to impose criminal liability, the sanction for an employee who violates a workplace rule is more appropriately restricted to a disciplinary matter between the employer and his employee (see, e.g., Anemone v Kross, 23 Misc 2d 186). It could well be that a violation of such rules would justify termination from employment,[3] but that cannot be equated with a violation of criminal law.
The People further rely on People v Di Dominick (94 Misc 2d 392). In that case, a New York City police officer, on limited assignment, was precluded by departmental regulations from carrying a firearm. While on limited assignment he allegedly agreed to kill two people and was charged with conspiracy to commit murder and criminal possession of a weapon in the second degree (Penal Law § 265.03, possession with intent to use unlawfully).
The trial court denied defendant’s motion to dismiss the weapons count of the indictment by finding the exemption of Penal Law § 265.20 inapplicable: In addition to its lack of precedential value, I find the court’s reasoning flawed in several respects, and I decline to follow it.
First, in citing Salata (supra) and its progeny, the court in Di Dominick (supra) overlooked the critical distinction, discussed above, that the cases were civil in nature. Their sole issue was whether an employer had the authority to issue reasonable regulations and make compliance with them a condition of employment; any impact such regulations would have on penal sanctions was never addressed.
Additionally, the court in Di Dominick (supra) used as authority a 1927 First Department case, People v Pianto (220 App Div 333), for the principle that when an officer’s superiors decide he is not eligible to carry a firearm, he is thus divested of the exemption granted him under section 265.20 of the Penal Law. The defendant in Pianto, however, was a police reservist and not a full-time police officer. The Legislature had specifically provided, under a 1917 statute, that a reservist only possessed the powers of a police officer when called to active duty, and the Legislature then expressly delegated to the Police Commissioner the authority to determine when a *151 reservist would be called. Since the defendant was a police reservist not called to active duty by the Police Commissioner at the time he possessed the weapon, the court, appropriately, held he was not entitled to the exemption. The Di Dominick court failed, however, to appreciate the limitations expressly provided in the 1917 statute relied on in Pianto, and ignored the distinction between the 1917 statute and the present one. The distinction is glaring. The current exemption is not limited solely to one class of police officers — such as "officers in good standing”. Nor has the Legislature delegated to the Police Commissioner any authority to modify the current exemption. Of course, the Commissioner can always terminate an officer’s employment, thereby eliminating any exemption, but the Commissioner did not take such action prior to the defendant’s arrest.
Finally, although not directly apposite to the present case, Di Dominick (supra) also erred in stating the exemption only applied to instances where a police officer’s weapon was possessed in furtherance of his lawful duties, and is unavailable when an officer harbors an intent to use his weapon unlawfully. Such a holding would eliminate completely an element of Penal Law § 265.03 (possession with intent to use unlawfully), namely, that the possession itself must be unlawful. Thus, Di Dominick’s reasoning on this point not only finds no support in the unambiguous language of the statute, but also fails to recognize that "[t]he essence of the illegal conduct defined in sections 265.01-265.05 of the Penal Law is the act of possessing a weapon unlawfully” (People v Almodovar, 62 NY2d 126, 130; emphasis supplied).
On the other hand, a persuasive analysis of the issue can be found in People v Desthers (73 Misc 2d 1085), where a court held that a police officer who possessed a blackjack in violation of departmental regulations could not be prosecuted for criminal possession of a weapon.
That court began its analysis by reaffirming the well-established rule that where a statute is unambiguous on its face, we need not resort to rules of statutory construction or become immersed in the history of a statute to define legislative intent. The court went further, however, and comprehensively examined both the legislative history of the exemption and the more recent efforts by the Legislature to amend it. It noted the statutory exemption had historically conferred a broad immunity upon police officers for all per se weapons violations. In comparison, other subdivisions of Penal Law *152 § 265.20 applying to people in the State or Federal military, and Wardens or Superintendents of a State prison have limited exemptions, applying only if they possess a weapon in pursuit of official duty or when duly authorized to carry the weapon by regulation or order. (Penal Law § 265.20 [1] [a], [d]; [2].)[4] No such qualification appears in the exemption for police officers. One must infer, then, that the Legislature specifically extended a broader exemption to police officers, including situations when they possess a weapon outside the scope of the departmental regulations (People v Desthers, 73 Misc 2d, supra, at 1091-1092). In effect, the People now ask me to read into subdivision (1) (b) of Penal Law § 265.20 the same limitations expressly stated in several other subdivisions but which are conspicuously lacking in the provision related to police officers.
Moreover, as noted in Desthers (supra), specific legislative proposals were repeatedly submitted in an attempt to eliminate the exemption for officers who possess a weapon outside the authorization of their employer (People v Desthers, 73 Misc 2d, supra, at 1093). The failure of the Legislature to adopt any of these measures is a further indication of the Legislature’s continuing approval of the broad exemption extended to police officers. There is simply no reason to believe the Legislature invested the police department with the power to modify that exemption.
Therefore, based on the unambiguous language of Penal Law § 265.20, as well as the Legislature’s intent to confer a broad immunity to police officers, I find that a suspended police officer remains entitled to the exemption of Penal Law § 265.20 until he is terminated from employment in accordance with departmental procedure. The gun possession charge, therefore, is dismissed.
THE FORGERY COUNT
Turning to the second count of the indictment I find that this charge must also be dismissed. The crime of criminal possession of a forged instrument in the second degree contains two essential elements: (1) possession of a forged instrument, and (2) intent to defraud.
*153 As to the second element, discussed below, it is clear on the facts of this case there was no intent to defraud. But even as to the first element, there is some authority which implies by analogy that an officer’s duplicate shield may not even be a forged instrument (People v Briggins, 50 NY2d 302).
A forged instrument is a written instrument which has been falsely made. (Penal Law § 170.00 [7].). "A person 'falsely makes’ a written instrument when he makes or draws a complete written instrument in its entirety * * * which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.” (Penal Law § 170.00 [4].)
Illustrative of a classic "forged instrument” is a check where the signature of the drawer is counterfeit. The true drawer is the "maker or ostensible maker” of the check and since his signature is unauthorized, the instrument is falsely made. However, the "maker or ostensible maker” of an instrument is not always so readily identified.
In People v Briggins (50 NY2d 302, supra) the Court of Appeals held that when a person signs his driver’s license, he becomes the "maker” of the license even though the license was issued by the Department of Motor Vehicles. Briggins involved the defendant’s use of a nom de plume in applying for and receiving a permit to drive. When his dual identity was discovered, he was indicted for criminal possession of a forged instrument in the second degree. The Court of Appeals, however, dismissed the indictment holding the license and license application were not "forged instruments”. The court stated, "[W]hen an individual signs a name to an instrument and acknowledges it as his own, that person is the 'ostensible maker’.” (50 NY2d, supra, at 307.) Thus, even though the license was issued by the Department of Motor Vehicles authorizing him to drive, the Court of Appeals apparently considered the license holder the "ostensible maker”. He became an "ostensible maker” when he signed the license.
In the present case, then, if the defendant is considered an ostensible maker or perhaps comaker of the shield, its possession would not be unlawful. This would be the case had the defendant signed a written statement which pronounced he was a police officer; he would clearly be the ostensible maker *154 of that "instrument” and it would not be a forgery. The focus, then, is on the shield, and whether its ostensible maker is the defendant or the police department.
I find somewhat appealing the argument that the badge number on the duplicate shield is analogous to the signature on the driver’s permit in Briggins (supra). The badge number would correctly identify the defendant if it were checked with the police department, and the defendant did not hold himself out to be anyone other than the person assigned that badge number by the police department. He was not "fictitious” nor was his "signature” a counterfeit. Confronted with the driver’s permit in Briggins, I cannot readily distinguish it from the present case.
But, as noted earlier, even if I determined the defendant was not the ostensible maker of the shield, the People have failed to establish the second requisite element. To establish a forgery, the People must show not only that the defendant possessed a "forged” shield but that he did so with intent to defraud. The shield, however, was a copy of the original with all the same markings. It therefore correctly identified the defendant as a police officer of the New York City Police Department. True, the defendant was not entitled by his employer to carry the badge, but exhibiting a replica of his badge was not, under the circumstances, criminally fraudulent. The defendant was ineligible for active duty but he was still a sworn officer of the New York City Police Department and his badge number was still solely and exclusively assigned to him. If asked, the defendant could truthfully say he was a New York City police officer; the badge only served to identify him as one.
The only reference in the Grand Jury minutes concerning the duplicate shield was when the defendant stated "I am a police officer, my shield’s in my pocket, can I get it?” Thus it is clear that the only evidence of defendant’s intent was his attempt to use the shield to identify himself as a police officer.[5] Since he was in fact a member of the New York City *155 Police Department, the display of the badge was not criminally fraudulent.
Accordingly, the defendant’s motion to dismiss the forgery charge is also granted.

. At this stage, the defendant has not contested the lawfulness of the stop and thus the predicate for the stop is irrelevant to this decision.

. To dismiss a member of the force is procedurally complex. Written charges and specifications must be served on the officer and he must be given no less than eight days to provide a written response. A Deputy designated by the Commissioner is then required to investigate the charges and hold a hearing, where the officer must be given an opportunity to be heard, including presenting witnesses in his behalf. If the officer is found guilty of the charges, the Deputy Commissioner forwards a recommendation to the Commissioner who is then empowered to impose a wide range of disciplinary sanctions, including reprimand, forfeiting and withholding pay for a specified time, suspension without pay for up to 30 days, or, lastly dismissal. Only upon the final decision of the Commissioner to elect dismissal as the punishment is an officer terminated from the force. (See generally, Administrative Code of City of New York § 14-115; Civil Service Law § 75; NY City Police Department Regulations §§ 118-11, 468-121.)

. I note that the police department, in fact, used defendant’s possession of the gun and duplicate shield as additional charges brought against him to have him terminated from the force.

. There is also some authority suggesting that "peace” officers, distinct from "police” officers, possess a limited exemption by virtue of CPL 2.30 which conditions a peace officer’s status upon successful completion of a firearms training course (1984 Atty Gen [Inf Opns] 40).

. I note that the Grand Jury was never advised that the defendant was, in fact, a police officer, albeit under suspension, evidence which may have *155 materially influenced their investigation of whether he intended to defraud another by referring to his police officer status (see, e.g., People v Suarez, 122 AD2d 861; People v Monroe, 125 Misc 2d 550).